***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Baddour and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Guide One Insurance was the carrier on the risk.
3. An employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an admittedly compensable injury on July 28, 2000.
5. Plaintiff's average weekly wage is $506.39, yielding a compensation rate of $337.60.
6. The following exhibits were admitted into evidence:
(a) Stipulated Exhibit 1: Pre-Trial Agreement
(b) Stipulated Exhibit 2: Indexed set of documents
(c) Stipulated Exhibit 3: Industrial Commission Forms
(d) Stipulated Exhibit 4: Medical Bills
(e) Stipulated Exhibit 5: Claims Payment History
(f) Defendants' Exhibit 1: Letter
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was a 44-year-old high school graduate with some additional education. Plaintiff worked for defendant-employer as an administrative assistant in the children's ministry department. In late July 2000, plaintiff was transferred for non-injury-related reasons to defendant-employer's athletic department, where she worked in a similar capacity.
2. On July 28, 2000, plaintiff was involved in a work-related car accident. Plaintiff injured both of her big toes, her cervical and lumbar spine, her left foot, left knee, right hand, ribs, and had a concussion. Defendants admitted the compensability of this accident and accepted liability for it through a Form 60 Admission.
3. On July 28, 2000, plaintiff went to the emergency room at Springs Memorial Hospital in Lancaster, South Carolina. The emergency room doctors diagnosed plaintiff with abrasions to her left knee and right hand, chest pain, left knee pain, and bilateral feet pain. The doctors advised plaintiff to follow up with her family doctor in Charlotte, North Carolina.
4. On August 3, 2000, plaintiff went to her family doctor, Dr. Carol Gardner, at Charlotte Medical Clinic. Among other things, Dr. Gardner diagnosed plaintiff with probable post-concussive headaches and she recommended that plaintiff go to a chiropractor, Dr. Tunis Hunt, for follow-up care for back and neck pain.
5. On August 4, 2000, plaintiff went to Dr. Hunt, who noted that plaintiff had pain in her left neck, head, upper trapezius, left hand, and left lower leg, and that plaintiff had headaches. Dr. Hunt treated plaintiff nine to ten times in August 2000.
6. Defendant-carrier then directed plaintiff to Miller Orthopedic Clinic in Charlotte, North Carolina, for follow-up care. Starting on August 18, 2000, plaintiff saw a variety of doctors and physicians' assistants at the Miller Clinic for her lower extremity and back pain.
7. Dr. Jeffrey Mokris and Dr. Robert Anderson at the Miller Clinic treated plaintiff for her lower extremity injuries, in particular, the injury to her left foot. Dr. Anderson prescribed physical therapy and advised plaintiff to get two pairs of orthotics to alleviate her foot pain. Dr. Anderson also anticipated that plaintiff would need to have surgery performed on her foot at some point in the future because of her injury. Dr. Anderson continues to treat plaintiff for her left foot injury.
8. Dr. John Welshofer at the Miller Clinic treated plaintiff for her cervical and lumbar pain. On November 27, 2000, Dr. Welshofer diagnosed plaintiff with cervical and lumbar sprains, and he recommended that plaintiff undergo chiropractic treatment, specifically with Dr. Daniel Bowker, a chiropractor with which Dr. Welshofer had experience. Dr. Welshofer was plaintiff's authorized treating physician.
9. Despite Dr. Welshofer's referral, defendant-carrier would not authorize treatment with Dr. Bowker.
10. Defendant-employer terminated plaintiff's job in November 2000. Although it is unclear whether this termination was related to plaintiff's injury, defendant-employer continued plaintiff's salary for approximately two months. Plaintiff worked part-time from November 2000 until September 2003, at which time she returned to full-time work.
11. On January 6, 2001, plaintiff had an MRI as ordered by Dr. Welshofer. The MRI showed age-consistent degenerative changes, with the exception of a mild disc bulge and mild facet effusion, or swelling. As a consequence, Dr. Welshofer released plaintiff to return to work on January 19, 2001, without work restrictions. At that time, Dr. Welshofer assigned a two percent permanent partial disability rating to plaintiff's back under the North Carolina Industrial Commission's Rating Guidelines.
12. On a pro se basis, plaintiff negotiated a Form 21 Agreement with defendants for the two percent permanent partial disability rating assigned by Dr. Welshofer on January 19, 2001. The parties entered into the Form 21 Agreement in June 2001, and the Commission approved the Form 21 Agreement on September 20, 2001. Defendants paid plaintiff six weeks of compensation at the rate of $323.08 per week. However, plaintiff's compensation rate should have been $337.60 per week. Pursuant to a consent order signed by both parties, defendants agreed to pay plaintiff an additional $87.12, which represents the difference between plaintiff's incorrect and correct compensation rate for the six weeks.
13. Notwithstanding defendants' refusal to authorize Dr. Bowker's chiropractic care, plaintiff followed Dr. Welshofer's advice and saw Dr. Bowker for her ongoing cervical and lumbar problems. Dr. Bowker treated plaintiff conservatively starting on February 12, 2001, and continuing through October or November 2001.
14. At some point in his treatment, Dr. Bowker referred plaintiff to Dr. Richard Park, a pain management specialist at SouthEast Pain Care, for cervical trigger point injections to alleviate her cervical pain and headaches.
15. Defendant-carrier would not authorize treatment with Dr. Park.
16. Plaintiff first saw Dr. Park on June 4, 2001, and last saw him on July 19, 2001. At that time, Dr. Park referred plaintiff back to Dr. Bowker for additional chiropractic management of her cervical and lumbar pain.
17. Dr. Bowker's chiropractic care, recommendations, and referrals helped to alleviate plaintiff's cervical pain to the point where she, at the time of the hearing in this case, did not have any ongoing cervical problems. However, Dr. Bowker's care did not alleviate the pain in plaintiff's lumbar spine. On November 17, 2001, Dr. Bowker referred plaintiff back to Dr. Welshofer for additional care and for a determination as to plaintiff's disability.
18. Between January 19, 2001 and March 6, 2003, plaintiff continued to have back pain on a regular basis and the pain became worse during this time period. Plaintiff did not see a doctor regularly for her back pain during this time because of financial reasons and the inability to continue paying for medical treatment that defendants refused to authorize.
19. Between January 19, 2001 and September 24, 2002, however, plaintiff did see Dr. Steven Karner, a neurologist, for her post-concussive headaches. Her family physician, Dr. Gardner, and one of Dr. Gardner's medical partners, Dr. Divish, referred plaintiff to Dr. Karner for ongoing treatment for her headaches. Dr. Karner recommended physical therapy and medications, but plaintiff could not afford the medications.
20. Defendants paid for plaintiff's initial appointments with Dr. Gardner. However, defendant-carrier would not authorize subsequent appointments with Dr. Gardner and would not authorize treatment with Dr. Karner.
21. On March 6, 2003, plaintiff returned to see Dr. Welshofer for the first time since January 19, 2001, upon the advice of Dr. Bowker. Because of plaintiff's persistent and continuous pain, Dr. Welshofer recommended another MRI. The March 2003 MRI showed a worsening and, according to Dr. Welshofer, a "clear change" of the condition for which he last treated plaintiff in January 2001. More specifically, the March 2003 MRI revealed a small annular tear at L5-S1, swelling and fluid in the outer annulus at that level, increased disk space narrowing, and a disk bulge at L5-S1. In his deposition testimony, Dr. Welshofer stated that if plaintiff continued to experience back pain between January 19, 2001 and March 6, 2003, plaintiff's March 2003 complaints would be consistent with and the probable result of her previous injury.
22. On June 23, 2003, Dr. Welshofer noted that plaintiff received 50% relief in her symptoms following an epidural administered on May 28, 2003. Dr. Welshofer further stated that he would perform another epidural on plaintiff in four weeks. Dr. Welshofer believed and the Commission finds that plaintiff's current back problems are causally related to plaintiff's motor vehicle collision, even though the onset of back symptoms occurred a few days after the actual time of the accident.
23. Because of the changes demonstrated between plaintiff's MRIs in January 2001 and March 2003, Dr. Welshofer increased plaintiff's permanent partial disability rating to the back from two to five percent under the North Carolina Industrial Commission's Rating Guidelines. Plaintiff experienced a change in her condition as of March 6, 2003.
24. On August 20, 2003, plaintiff filed a Form 33 Request for Hearing, seeking payment of medical compensation.
25. Since March 2003, Dr. Welshofer and his medical associate, Dr. Joseph Zuhosky, have ordered additional testing and treatments, which confirmed a progression or worsening of plaintiff's lower back problems. The additional testing includes a nerve conduction study or EMG, epidural steroid injections, and a discogram, which was performed on December 31, 2003.
26. Plaintiff was unable to work because of her discogram from December 31, 2003 through January 5, 2004.
27. On February 9, 2004, a second Form 21 Agreement was approved by the Commission for a five percent permanent partial disability to plaintiff's left foot. Pursuant to the agreement, defendants paid plaintiff 7.2 weeks of compensation at a rate of $337.60 per week for the permanent functional impairment to her foot.
28. The greater weight of the evidence of record establishes that plaintiff's cervical and lumbar back conditions from the time of the Form 21 Agreement in June 2001 to the present are causally related to her compensable accident at work on July 28, 2000.
29. The medical treatment provided and recommended by Drs. Gardner, Hunt, Mokris, Anderson, Welshofer, Zuhosky, Bowker, Park, and Karner has been reasonable and necessary to treat plaintiff's compensable medical conditions.
30. Between entering the Form 21 Agreement for her back in June 2001 and the date of the Deputy Commissioner's hearing of this case, defendants did not pay for any of plaintiff's medical treatment for her back, including the treatment and referrals provided by her authorized treating physicians. Plaintiff had to file these expenses under alternative insurance coverage or paid for these expenses herself, which total at least $39,936.42.
31. Defendants did not have reasonable grounds for contesting plaintiff's right to additional medical treatment recommended by plaintiff's authorized treating physicians, Dr. Gardner and Dr. Welshofer, or for denying the recommendations and referrals by the physicians and medical professionals to whom Dr. Gardner and Dr. Welshofer referred plaintiff.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of her employment on July 28, 2000. N.C. Gen. Stat. § 97-2(6).
2. In a claim for additional compensation for medical treatment, the treatment must be "directly related to the original compensable injury."Pittman v. Thomas Howard, 122 N.C. App. 124, 130, 468 S.E.2d 283,286, disc. review denied, 343 N.C. 513, 471 S.E.2d 18 (1996). It is the burden of the injured worker to prove that the injury or condition being treated is causally related to the compensable injury by accident. Sneadv. Mills, Inc., 8 N.C. App. 447, 174 S.E.2d 699 (1970). The North Carolina Court of Appeals stated in Parsons v. Pantry, Inc.,126 N.C. App. 540, 485 S.E.2d 867 (1997) that once the Commission has found a claim compensable, a rebuttable presumption arises that the treatment is directly related to the original compensable injury. The burden then shifts to defendants to prove that the medical treatment is not directly related to the compensable injury. Id. In Reinninger v.Prestige Fabricators, Inc., 136 N.C. App. 225, 523 S.E.2d 720 (1999), the Court of Appeals applied the Parsons presumption to a case in which the parties entered into a Form 21 Agreement for Compensation which was approved by the Commission and therefore constituted an "award" of the Commission, pursuant to N.C. Gen. Stat. § 97-82.
3. In the case at bar, the greater weight of the evidence of record establishes that plaintiff's cervical and lumbar back conditions from June 2001 to the present are directly and causally related to her injury by accident on July 28, 2000. As such, the Parsons presumption applies and defendants failed to rebut the presumption that the medical treatment is directly related to the compensable injury. Parsons v. Pantry, Inc., supra.
4. Plaintiff's claim for further compensation is not time barred because of the two-year time limitation in N.C. Gen. Stat. § 97-47. Defendants argue that plaintiff did not file her claim for a change of condition within two years of the last payment of compensation to plaintiff owed under the Form 21 Agreement for the permanent functional impairment to her back, which was paid June 10, 2001. Plaintiff filed a Form 33 Request for Hearing on August 20, 2003, which was not within two years from the last payment of compensation for her back. However, on February 9, 2004, a second Form 21 Agreement was approved by the Commission for the five percent permanent partial disability to plaintiff's left foot. Therefore, as of the payment of compensation for the impairment to plaintiff's back in June 2001, the full extent of plaintiff's permanent disability as a result of the compensable injury by accident, including ratings for permanent impairment to other parts of her body, had not yet been determined and had not been reviewed by the Commission. As such, the two-year limitations period of N.C. Gen. Stat. § 97-47 had not run.Beard v. Blumenthal Jewish Home, 87 N.C. App. 58, 359 S.E.2d 261
(1987), disc. rev. denied, 321 N.C. 471, 364 S.E.2d 918 (1988).
5. As of March 6, 2003, plaintiff sustained a change of condition in her back, as evidenced by Dr. Welshofer's increase in plaintiff's permanent partial disability rating from two to five percent under the North Carolina Industrial Commission Rating Guidelines. A change in the degree of permanent disability is evidence of a change of condition within the meaning of N.C. Gen. Stat. § 97-47. McLean v. RoadwayExpress, 307 N.C. 99, 296 S.E.2d 456 (1982); West v. Stevens Co.,12 N.C. App. 456, 183 S.E.2d 876 (1971). In addition, plaintiff also sustained a change in her wage earning capacity and was temporarily totally disabled from any employment for the period December 31, 2003 through January 5, 2004.
6. As the result of her change of condition, plaintiff was temporarily totally disabled and is entitled to additional temporary total disability compensation for the period from December 31, 2003 through January 5, 2004, at the rate of $337.60 per week. N.C. Gen. Stat. § 97-29.
7. As the result of her change of condition, plaintiff is entitled to permanent partial disability compensation for the additional three percent rating to her back at the rate of $337.60 per week for nine weeks. N.C. Gen. Stat. § 97-31(23).
8. Plaintiff is entitled to payment in the amount of $87.12, which represents the difference between plaintiff's incorrect and correct compensation rate for the six weeks of compensation ordered by the Form 21 approved September 20, 2001.
9. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of her compensable medical conditions as may reasonably be required to effect a cure, provide relief, or lessen the period of disability. The Commission may at any time upon the request of an employee order a change of treatment and designate other treatment suggested by the injured employee, subject to approval of the Commission. N.C. Gen. Stat. §§ 97-2(19); 97-25.
10. Plaintiff is entitled to attorney fees in the amount of $9,984.00 (an amount equal to 25% of the cost of the medical treatment not approved by defendants) for defendants' defense of this claim regarding payment of medical treatment without reasonable grounds. N.C. Gen. Stat. § 97-88.1;Palmer v. Jackson, 157 N.C. App. 625, 579 S.E.2d 901 (2003).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendants shall pay temporary total disability compensation to plaintiff at the rate of $337.60 per week for the period from December 31, 2003 through January 5, 2004. Because this compensation has accrued, it shall be paid in a lump sum.
2. Subject to the attorney's fee approved below, defendants shall pay plaintiff for an additional three percent permanent partial disability rating to the back for nine weeks at the rate of $337.60 per week. Because this compensation has accrued, it shall be paid in a lump sum. Defendants shall pay plaintiff $87.12, which represents the difference between plaintiff's incorrect and correct compensation rate for the six weeks of compensation ordered by the Form 21 approved on September 20, 2001.
3. Defendants shall pay for medical expenses incurred or to be incurred as a result of plaintiff's compensable medical conditions as may reasonably be required to effect a cure, provide relief, or lessen the period of disability. The approved medical expenses include, but are not limited to, all treatment provided and recommended by Drs. Gardner, Hunt, Mokris, Anderson, Welshofer, Zuhosky, Bowker, Park, and Karner.
4. A reasonable attorney's fee in the amount of 25% is hereby approved to be deducted from sums due plaintiff under paragraphs 1, 2 and 3 of this Award and paid directly to plaintiff's counsel. In addition, defendants shall pay a reasonable attorney fee to plaintiff's counsel of $9,984.00 (an amount equal to 25% of the cost of the medical treatment not approved by defendants). Said attorney fee is hereby taxed as costs to defendants pursuant to N.C. Gen. Stat. § 97-88.1.
5. Defendants shall pay the costs.
This the 6th day of July, 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER